**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

**CIVIL ACTION NO. 09-206-DLB-CJS**

**BILLIE BRADFORD**                                                                                    **PLAINTIFF**

**vs.**                                    **MEMORANDUM OPINION & ORDER**

**DEPARTMENT OF COMMUNITY BASED SERVICES,**
***Commonwealth of Kentucky***                                              **DEFENDANT**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Billie Bradford commenced this action against her employer, Defendant Department of Community Based Services, for allegedly subjecting her to a hostile work environment based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, and Kentucky's Civil Rights Act, KRS 344.010 *et seq.*  Specifically, Plaintiff alleges that Ms. Lisa Stander, another employee of Defendant, sexually harassed her over a one-year period, creating a hostile work environment for which Defendant is vicariously liable.

This matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. # 36), which has been fully briefed by both parties. (Docs. # 62, 67).  On January 26, 2012, the Court held oral argument to consider Defendant's motion.  Plaintiff, who was present, was represented by Attorney Ted Wills; Defendant was represented by Attorney Jennifer Wolsing.  At the close of oral argument, the Court denied Defendant's motion.  By this Memorandum Opinion and Order, the Court provides its specific reasons

1

for doing so.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Billie Bradford ("Bradford") began her employment with Defendant Department of Community Based Services ("DCBS") in January 2003 as a Social Worker I. DCBS is an administrative agency of the Commonwealth of Kentucky charged with, among other things, the responsibility of maintaining a "twenty-four hour on-call response system for emergency reporting" of domestic violence and investigating any reports of domestic violence, and physical or sexual abuse. 922 KAR 5:102 §§ 2(3)-(5). Employees of DCBS work in small teams to receive, investigate and assess reports of violence and abuse. Bradford's team consisted of twelve individuals, including eleven women and one man. In 2005, Bradford was notified by her supervisor that her work performance merited a promotion; she was subsequently "reclassed" as a Social Worker II. In that position, she "investigate[d] domestic violence . . . abuse on women and men, sometimes children" and "[made] referrals to help them . . . if they wanted to leave the abusive situation," which included finding the victims a place to live and advising them on accessing the judicial system.

In 2006, Bradford was again notified by her supervisor that she was being considered for a promotion. Before being promoted, Bradford suffered from a stroke and was forced to take a one-year leave of absence from work. When she returned to DCBS in May 2007 in her same position as a Social Worker II, the conduct for which she brings this complaint began.

**A.      Conduct and Comments Directed at, Observed or Heard by Bradford**

Lisa Stander ("Stander") began visiting Bradford in her office on a daily basis, staying for anywhere between five and thirty minutes at a time, which is when most of the offensive comments and conduct occurred.  (Doc. # 47, at 54).  Stander, wearing a skirt or a dress, would sit at Bradford's desk, prop her feet up, and spread her legs nearly three feet apart.  (*Id.*).  Stander would then "rub her leg up and down . . . from her ankle to her behind."  (*Id.*).  If Stander was wearing a "wide-tailed skirt, she would prop her legs up and wad [the skirt] up and put it down between her legs . . . [revealing] her panties."  (*Id.*).  In response to this conduct, Bradford would tell Stander that "God don't like ugly."  (*Id.* at 55).

Also on a daily basis, while in Bradford's officer, Stander would "put her hands up under her shirt and rub her breasts."  (*Id.* at 60).  Sometimes Stander would "rear back in her chair and put her hands down . . . in her pants," often unbuttoned, "as if massaging her self [sic]."  (*Id.*).  At other times, Stander would pull up her shirt and rub her stomach in front of Bradford.  (Pl. Dep. 62).  At least twice Bradford observed Stander standing in the hallway with her hands up her shirt or down her pants.  (Compl. ¶ 23).  In response to this conduct, Bradford would tell Stander, "Lisa, don't do that.  God don't like ugly."  (Doc. # 47, at 64).

Stander's vocabulary often matched her sexually explicit conduct.  Stander used the "MF" and "F" word consistently in her conversations with coworkers.  (*Id.* at 66).  Stander routinely described other coworkers to Bradford in a sexual manner, often commenting on their "behinds."  (*Id.* at 64).  Once or twice a week, Stander described her coworker, Diana Garrett's, bottom as "bootylicious."  (Garrett Dep. 38).  On one occasion, Bradford observed Stander walking behind Garrett, stating "ooh, bootylicious, hmm, hmm, hmm, [while]

3

wiggling her hips working her hands . . . like she's massaging [Garrett's] behind." (Doc. # 47, at 118).   Stander also described another coworker's behind as a "butterfly butt," meaning that it looked like a "butterflied pork chop."  (Doc. # 48, at 56).  Stander described a third coworker as having "a big butt, but her stomach is bigger than her behind, and her boobs will hang out over her stomach."  (Doc. # 47, at 64).  While making these sexual observations, Stander sometimes had her hands down her pants or rubbed her breasts or stomach.  (*Id.*).

On one occasion, Stander and Bradford were standing among other coworkers when Stander announced that she had "been to [their supervisor's house] and made love to [her]."  (*Id.* at 66).  Stander then looked at another female coworker and said, "I've been to your house and made love to you [too]," causing the coworker to turn red in the face.  (*Id.*).

In February or March of 2008, Stander brought four of five jars of Vaseline to a team meeting that Bradford attended.  (Compl. ¶ 28).  On each of the jars, Stander had placed a label that said, "Team Topical Treatment."  (*Id.*).  Stander said, "When [the supervisor] is riding your ass and it is chapped, you can use this to grease it up."  (*Id.*).

In May 2008, Stander brought another jar of Vaseline to Bradford's office and told Bradford she was "going to need it. [The supervisor's] going to be riding your ass hard." (Doc. # 47, at 73-74).  Showing her displeasure for Stander's conduct, Bradford gave the Vaseline back, but Stander again handed it to Bradford and said to keep it.  Bradford then took the jar to Stander's office and left it on her desk.  A short while later, Stander returned the jar to Bradford, again telling Bradford she was going to need it.

On June 20, 2008, Stander's offensive conduct came to a head.  Bradford was seated at her desk when she heard Stander, who was standing in the hallway, yell out to

another coworker.  Bradford looked out her office doorway and saw Stander pull down her pants and expose her naked backside to the approaching coworker.  Expressing her disapproval, Bradford exclaimed, "Lisa, no you didn't."  (*Id.* at 107).  In a grievance filed with DCBS, the victimized coworker explained that she felt "not only embarrassed but disrespected and awkward, in a word, offended" by Stander's conduct.  (Pl. Ex. 7 at 001200).  Bradford also filed a grievance with DCBS after this incident requesting that Stander be reprimanded. (Doc. # 47, at 52).

### B.    Comments and Conduct Directed at, Observed or Heard by Other Employees

Bradford's coworkers witnessed much of the conduct and heard many of the comments that form the basis of Bradford's complaint.  They also verified the frequency at which the comments or conduct occurred.  For example, Diana Garrett routinely witnessed Stander at various locations in the office rubbing her breasts and stomach, both underneath and on top of her shirt.  Garrett also verified that Stander would frequently sit, wearing a dress or skirt, with her legs propped up and spread open, and that Stander would sometimes rub her legs near her crotch.  Another coworker, Justine Smith, explained that Stander "was always touching herself, touching her boobs, pulling up her shirt, touching her belly, sticking her hands in her pants."  (Smith Dep. 41).

Aside from verifying the conduct that Bradford complains of, Bradford's coworkers also described other offensive, sexually charged comments or acts by Stander.  For example, Lorraine Webster recounted a time when another coworker arrived at the office in a new suit, and Stander openly commented that "she [was] getting wet in her pants because [the coworker] looked so good" and that she "wanted to slip [the female coworker]

5

some tongue." (Webster Dep. 25). Webster described a similar incident where Stander said that she wanted to give a coworker a hug "so she could feel her soft squishy breasts." (*Id.* at 30). Stander made these types of comments to Webster at least once or twice a week.

Justine Smith described an incident where she and Garrett passed by Stander as they were coming back to the office from lunch. (Smith Dep. 41). Both women observed Stander standing by the door "with her hands cupped and she was making" this "slurping noise" and "saying bootylicious." (*Id.* at 41-42). When Smith asked Garrett about Stander's actions, Garrett, visibly embarrassed, explained that "[Stander] does it when she sees my butt moving." (*Id.*).

### C.   Bradford's Friendship with Stander

Although Stander's conduct was crude and offensive on its face, the nature and duration of Bradford's friendship with Stander must also be considered to appropriately place some of Stander's actions in context. Bradford admits that she became friends with Stander in 2003. The two socialized outside of the workplace in 2005, going to the movies or to each others' homes for dinner. When Bradford took the one-year leave of absence in 2006, Stander visited Bradford at her house and called to check on her progress.

However, when Bradford returned to work in 2007, her friendship with Stander began to wane. In fact, the two stopped socializing away from the office in October 2007 because Bradford was "having problems with the way Stander was treating other coworkers." (Doc. # 47, at 80, 103). Around this time Bradford began considering Stander a "coworker" and no longer a "friend." (*Id.* at 103). Bradford claims that their friendship completely ended in June 2008 after Bradford filed a grievance against Stander for

6

"mooning" her coworker.  Bradford does, however, acknowledge that it was Stander that ended the relationship.

During their friendship, Bradford acknowledges that she mentioned, to some degree, her sex life with her husband to Stander.  While Stander was visiting Bradford  during her leave of absence, Bradford expressed concern that her husband no longer found her sexually desirable.  Aside from discussing the age of Bradford's husband as a possible explanation, the two did not discuss any other details of Bradford's sex life.

Bradford also acknowledges that she occasionally sent Stander and other coworkers non-work related emails, but denies that any of the emails were sexual in nature.  In 2006, Bradford forwarded an objectionable email of a cartoon depicting Santa Claus "mooning" the recipient to all of her team members, including Stander.  In December 2008, Bradford was reprimanded by DCBS for sending inappropriate emails to her coworkers.

### D.   Bradford's Complaints to Supervisors and the DCBS Sexual Harassment Policy

Despite Bradford and Stander's friendship, Bradford began expressing displeasure with Stander's conduct in May 2007.  In fact, on a daily basis beginning in May 2007, Bradford told Stander that "God don't like ugly" in response to Stander's crude behavior.  (Doc. # 47, at 55).  Coworkers heard Bradford make this comment to Stander so much that it "became a thing around the office."  (*Id.*).  Lorraine Webster testified that she heard Bradford make the comment "quite frequently . . . [a]nd usually when [Bradford] would say that, my assumption was it was something that [Stander] said that [Bradford] didn't appreciate."  (Webster Dep. 38).

7

Beginning in June 2007, Bradford made monthly verbal complaints to her supervisor, Angie Taylor, about Stander's conduct. (Doc. # 47, at 68). However, Taylor would simply respond, "Now Lisa," "Lisa quit," or "Lisa Stop," and take no further action (*Id.*). Lorraine Webster confirmed that Taylor was often present when Bradford objected to Stander's conduct, but that Taylor "just laughed it off." (Webster Dep. 39). On one occasion, Bradford brought her concerns about Stander's behavior to Taylor, but Taylor only suggested that Bradford should talk to Stander and attempt to resolve the problems.

Bradford was not the only employee to make informal, verbal complaints about Stander's conduct. After hearing Stander say that a coworker made her "get[] wet in her pants because she looked so good" in front of other employees and clients, Lorraine Webster approached Angie Taylor to discuss Stander's behavior. (Webster Dep. 23). Webster informed Taylor that Stander's behavior made employees uncomfortable and also made it more difficult for the employees to meet with clients in the office. (*Id.* at 24). However, Taylor "basically told [Webster] that they were just having fun, mind your own business." (*Id.*). In fact, Webster "[felt] that Taylor would get very frustrated with [her] if [she] complained about anyone at any time." (*Id.*).

Although both Bradford and Webster's complaints to Taylor were informal, verbal expressions of displeasure with Stander's conduct, DCBS officials acknowledge that the verbal complaints sufficiently brought the matter to the attention of a supervisor. Joel Griffith, an upper-level official of DCBS who had great familiarity with DCBS's anti-sexual harassment policy, agreed that Bradford's verbal complaints to her supervisor, Taylor, sufficiently put Taylor on notice of Stander's conduct. Likewise, Patti Murphy, another upper-level official of DCBS, affirmed that Bradford sufficiently brought Stander's offensive

8

conduct to Taylor's attention.   On one occasion, Taylor and Bradford  simultaneously witnessed Stander with her hands down her pants and up her shirt.  Bradford then asked Taylor whether she saw Stander's conduct. Murphy acknowledged that by pointing out Stander's conduct to Taylor, Bradford sufficiently complied with the reporting requirements of DCBS's anti-sexual harassment policy.

Bradford recognizes that Taylor did meet with Stander in response to some of Bradford's complaints.  Bradford admitted that "when she complain[ed] to [Taylor], then [Taylor] goes to [Stander], and then something else happens."  (Doc. # 47, at 75). However, Bradford was not present for the meetings between Taylor and Stander and, therefore, was not aware of what was discussed.  Even after Taylor discussed Bradford's complaints with Stander, Stander's offensive conduct continued.

Despite repeated verbal complaints to Stander and Taylor, Stander's offensive conduct did not cease until Bradford filed an official grievance.  On May 27, 2008, Bradford filed a grievance against Stander because Stander "'mooned' a fellow employee in [Bradford's] presence."  (Pl. Ex. 24, 00196).  Bradford's grievance also stated, that "[she has] come to [Taylor] on a number of occasions, in confidence, with [her] concerns about the conducts of Ms. Stander, to no avail." (*Id*.).  While Angie Taylor responded that "at no time have you come to me with any concerns of this magnitude or this type," (Pl. Ex. 24, 00204) Stander was ultimately suspended for some time because of the "mooning" allegations.  When Stander returned from suspension, Bradford acknowledges that her work performance was no longer affected by Stander.

### E.    Complaint to EEOC

On December 16, 2008, Bradford filed a charge of discrimination with the Equal

9

Employment Opportunity Commission ("EEOC") alleging that Stander's conduct created a hostile work environment based on sex.  On September 23, 2009, the EEOC notified Bradford that, based upon its investigation, the EEOC was unable to conclude that Title VII of the Civil Rights Act was violated by DCBS.  However the EEOC also gave Bradford a notice of right to sue.

Bradford subsequently filed this complaint alleging that she was subjected to a hostile work environment based on sex in violation of Title VII of the Civil Rights Act and the Kentucky Civil Rights Act.  After extensive discovery, DCBS filed a motion for summary judgment on all of Bradford's claims.

## II.  ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, it must produce evidence showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record as a whole, a rational

10

fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

**B.    Hostile Work Environment Claims**

Defendant moves for summary judgment on both of Plaintiff's hostile work environment claims, the first arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, and the second under the Kentucky's Civil Rights Act, KRS 344.010 *et seq.* "A sexual harassment claim brought under the Kentucky Civil Rights Act . . . is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart." *Clark v. United Parcel Services, Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-98 (Ky. 2000)).  To establish a prima facie case of sexual harassment created by a hostile work environment, a plaintiff must show:

(1)    she is a member of a protected class,

(2)    she was subjected to unwelcome sexual harassment,

(3)    the harassment was based on her sex,

(4)    the harassment created a hostile work environment, and that

(5)    the employer is vicariously liable.

*Id.* Defendant contends that Plaintiff has failed to plead or prove facts sufficient to establish elements (2) through (5) of her claim.

Before considering each element, it is important to note that same-sex sexual harassment is actionable under Title VII.  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998).  Like all Title VII cases, the critical issue in a same-sex sexual harassment claim is "'whether members of one sex are exposed to disadvantageous terms

11

or conditions of employment to which members of the other sex are not exposed.'"  *Id.* at

80.  (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993)).  In *Oncale*, the

Supreme Court opined that "[a] trier of fact might reasonably find such discrimination, for

example, if a female victim is harassed in such sex-specific and derogatory terms by

another woman as to make it clear that the harasser is motivated by general hostility to the

presence of women in the workplace."  *Id.*

### C.    Material Issues of Fact Exist as to Whether Plaintiff was Subjected to Unwelcome Sexual Harassment

To establish that the alleged conduct was "unwelcome," the plaintiff must have

neither solicited nor invited the conduct, and must have indicated by her own conduct that

the alleged harassment was unwelcome.  *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958,

966 (8th Cir. 1999).  If the plaintiff engaged in behavior similar to that which she claims was

unwelcome and offensive, the alleged harassment cannot be unwelcome.  *Id.*  Similarly,

"the existence of a current or former social relationship between the harasser and the

harasee can shed light on . . . whether the complained-of conduct was unwelcome . . . ."

*Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chicago*, 488 F.3d 739, 746-

47 (7th Cir. 2007).  However, a relationship, be it a friendship or a consensual sexual

relationship, between the plaintiff and the alleged harasser "is by no means dispositive of

the sexual-harassment claim."  *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir.

2010) (quoting *Ammons-Lewis*, 488 F.3d at 746-47).

Plaintiff has certainly alleged enough facts for a reasonable juror to conclude that

Stander's conduct was unwelcome.  Beginning in May 2007, when Stander would come

into Plaintiff's office, put her feet on Plaintiff's desk, pull up her dress, and rub her legs,

Plaintiff routinely responded, "Lisa . . . you shouldn't do that.  God don't like ugly."  In fact, Plaintiff told Lisa that "God don't like ugly" so much that the phrase became popular around the office.  On one occasion, Plaintiff expressed her displeasure with Stander's behavior to her supervisor, Angie Taylor, while in Stander's presence. Together these comments and complaint's about Stander's behavior could lead a reasonable juror to conclude that Stander's conduct was unwelcome.

Defendant argues, to no avail, that Plaintiff's expression, "God don't like ugly," does not indicate that Stander's behavior was unwelcome.  Instead, Defendant asserts that Plaintiff routinely made the comment as a joking response to Stander's conduct.  Mr. Tim Rees, a coworker of Plaintiff, recalls Plaintiff saying "God don't like ugly all the time," but he recalls her saying it "in a joking fashion and laughing about it."  (Rees Dep. 38).  While this may be true, the Court must draw all reasonable inferences in favor of Plaintiff as the non-moving party when considering this motion for summary judgment.  *See Matsushita*, 475 U.S. at 587.  In fact, Webster, another coworker, recalls that Plaintiff made this comment "quite frequently . . . [a]nd usually when [Plaintiff] would say that, my assumption was it was something that [Stander] said that [Plaintiff] didn't appreciate." (Webster Dep. 38). Ultimately, Plaintiff's statement to Stander that "God don't like ugly," coupled with her complaint to Taylor raise an issue of material fact as to whether Stander's conduct was unwelcome.

### 1.    Plaintiff's Friendship with Stander

Defendant also argues that Plaintiff's friendship with Stander belies Plaintiff's claim that Stander's behavior was unwelcome.  Defendant cites several cases for the proposition that courts are reluctant to find that alleged harassment is truly unwelcome when the

13

plaintiff and alleged harasser are friends.  *See Drummond v. IPC Intern., Inc.*, 400 F. Supp. 2d 521, 534 (E.D.N.Y) 2005; *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 872 (5th Cir. 1999); *Christian v. Merchants Service Corp.*, 45 F.3d 432 (6th Cir. 1994) (table).   However, as Defendant appropriately conceded at oral argument, these cases do not dictate a judgment in favor of Defendant.  All of these cases suggest that while the duration and scope of the plaintiff's friendship with the alleged harasser should be considered, a friendship does not definitively negate the "unwelcome" element.  *See Drummond*, 400 F. Supp. 2d at 534-55; *Shepherd*, 168 F.3d at 872; *Christian*, 45 F.3d at *1.

The Court recognizes that Plaintiff's alleged friendship with Stander may cast doubt on whether Stander's behavior was unwelcome.  However, genuine issues of material fact exist about the friendship, such as its nature and duration, precluding judgment in favor of Defendant on this element of the Title VII claim.   While Defendant cites deposition testimony that suggests Plaintiff and Stander remained friends throughout the time period at issue, Plaintiff testified that she did not socialize with Stander outside the office "when everything got really bad" in October 2007.   Plaintiff also testified that the two stopped going to lunch together around this time.   This conflicting testimony precludes the Court from finding that Bradford remained friends with Stander and welcomed her obnoxious behavior.

### 2.    Plaintiff's Similar Conduct

Defendant argues that Plaintiff's own behavior "sometimes mirrored Ms. Stander's," showing that Stander's behavior was not unwelcome.  However, Defendant's argument is without merit.   Courts have recognized that a plaintiff fails to prove that the alleged

14

harasser's behavior was unwelcome when the plaintiff "engaged in behavior similar to that which she claimed was unwelcome and offensive." *Scusa*, 181 F.3d at 966.  For example, in *Scusa v. Nestle U.S.A. Co., Inc.*, the plaintiff alleged that the harassers yelled at her, called her a "f_____ b_____," were rude to her, and one harasser would "thump [the plaintiff's] head." *Id.* at 963, nn.2-3.  However, the Eighth Circuit held that the harassers' behavior was not unwelcome because the plaintiff engaged in similar behavior by yelling at coworkers, calling another coworker a "f_____ p_____," using crude language such as the "f" word in front of both men and women, and "chewing out" another coworker.  *Id.* at 966.

The facts of this case are distinguishable from *Scusa*.  Stander's crude and vulgar behavior occurred on a near-daily basis, particularly between May 2007 and June 2008. Her behavior included exposing her undergarments by spreading her legs that were propped on Plaintiff's desk, unbuttoning her pants, reaching her hands down her pants, pulling up her shirt, rubbing her legs and thighs up to her buttocks, rubbing her breasts, and talking about sexual relationships she had or desired to have with coworkers.

On the other hand, Plaintiff's allegedly similar behavior ceased well before Stander's offensive behavior began.  In 2006, Plaintiff called her own son a "whore" in front of Stander.  In December 2006, Plaintiff sent an email to her coworkers, including Stander, depicting a cartoon Santa "mooning" the recipient.  Plaintiff also admits that she once expressed concern about her lack of a sexual relationship with her husband to Stander, and that she discussed her breasts with Stander.  However, Stander admits that from  May 2007 until July 2009, Plaintiff never had conversations with her about sex and never

15

conducted herself in a way that implicated sex.  (Stander Second Dep. 24).[1]

Not only did Plaintiff's conduct cease well before Stander's allegedly offensive conduct began in May 2007, Plaintiff's conduct was far less extreme, vulgar, or frequent as Stander's.  Multiple coworkers verified during their depositions that Plaintiff never made sexually inappropriate comments or engaged in sexually inappropriate conduct at work. The few isolated incidents that Defendant offers as proof of similar conduct is insufficient to establish that Defendant's behavior was truly similar to Stander's.  As a result, a genuine issue of material fact exists as to whether Plaintiff was subjected to unwelcome sexual harassment.

### D.  Material Issues of Fact Exist as to Whether the Harassment was Based on Sex

In *Oncale v. Sandowner Offshore Services, Inc.*, a case of same-sex sex discrimination, the Supreme Court held that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination based on sex."  523 U.S. at 81.  A plaintiff may prove discrimination based on sex, for example, by showing she was "harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace."  *Id.*  Alternatively, the plaintiff may "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."  *Id.* at 81-82.  Regardless of which evidentiary route the plaintiff chooses to  follow, the plaintiff

---

[1]    Defendant argues that in February 2010, Plaintiff forwarded five photographs, all of which depict a large-breasted woman in various states of undress, from her work email, which adds additional support that Plaintiff acted in a similar fashion.  However, Plaintiff only forwarded these pictures to her own daughter; none of her coworkers saw the pictures.  Even if this conduct is similar to Stander's, Stander never saw or knew about the email and would not, therefore, have reason to believe that her own behavior was welcome based on Plaintiff's email.

"must always prove that the conduct at issue was not merely tinged with offensive sexual connotation, but actually constituted '*discrimination* . . . because of . . . sex." *Id.* at 81 (emphasis in original).

Adding to the Supreme Court's precedent in *Oncale*, the Sixth Circuit recently held that the "based on sex" requirement may be met by proving that the conduct is explicitly sexual and patently degrading to women. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009). As a result of being exposed to such conduct, a woman "suffer[s] . . . greater disadvantages in the terms and conditions of [her] employment than men." *Id.* Therefore, in such cases, the plaintiff does not need to show that the conduct evinces anti-female animus.[2] *Id.* Instead, the plaintiff must only demonstrate that a reasonable person, regardless of gender, would consider the sexually offensive conduct and comments more offensive to women than men in order to find that the behavior is discriminatory based on sex. *Id.* at 272.

### 1.   Comparative Evidence in the Mixed-Sex Workplace

Defendant argues that Stander's inappropriate behavior did not change around Rees, the sole male in the office, and was therefore not based on sex. Defendant's argument is unavailing. The record reflect that Stander did conduct herself in an inappropriate and offensive manner around Rees. However, based on the deposition testimony, a reasonably juror could conclude that her crude behavior was significantly more

---

[2]   This holding distinguishes the case of explicitly sexual and patently degrading harassing conduct from harassing conduct that is not sexually explicit. *Gallagher*, 567 F.3d at 271. In *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999), the Sixth Circuit previously held that in order to meet the "based on sex" elements, the plaintiff must show that the conduct "occurred because she is a woman." *Gallagher*, 576 F.3d at 272. However, in *Gallagher*, the Sixth Circuit clarified that the plaintiff need not prove the conduct "occurred because she is a woman" when the conduct is explicitly sexual and patently degrading.

17

limited and infrequent around Rees than it was around Plaintiff and the other females in the workplace.

Rees testified that Stander rubbed her stomach in front of him, though he does not recall Stander exposing any skin.  On occasion, he vaguely remembers seeing Stander put her hand down her pants, but only up to the top of her second knuckle.  Rees also recalls Stander using the "F and MF words" as well as saying she "laughed so hard that she had to pee."  This is the extent of Stander's offensive behavior around Rees.

Stander's behavior around females was significantly more frequent and severe.  For instance, Rees never saw Stander stick her hands all the way down her pants and make a motion as if she was massaging herself.  Although Rees saw Stander seated in Plaintiff's office with her feet on Plaintiff's desk, Rees never saw Stander reveal her upper leg.  He also never witnessed Stander (1) pull up her shirt and expose the skin on her stomach; (2) reach under the top of her shirt to rub her breasts; (3) wad up her skirt such that her legs and thighs were exposed; (4) unbutton or loosen her pants in the presence of coworkers; or (5) "moon" her coworkers.  Plaintiff and other female coworkers  frequently saw Stander engage in this sort of lewd behavior.

In addition, Rees never heard Stander make sexual references about her coworkers, such as describing one as having a "butterfly butt" or another as being "bootylicious."  He also never heard Stander describe another female coworker as having "a big stomach that was bigger than her behind," or that a female's "boobs were hanging out over her belly."  Moreover, Rees never heard Stander describe her sexual interactions with fellow female coworkers.  However, Stander frequently made these types of remarks around females in the workplace.  Based on this overwhelming discrepancy in Stander's behavior towards

18

men and women, Plaintiff has brought forth sufficient evidence to create a genuine issue of material fact as to whether Stander's behavior was "based on sex."

### 2.    Sex Specific Conduct

Plaintiff has also brought forth sufficient evidence to create a genuine issue of material fact as to whether Stander's conduct was explicitly sexual and patently degrading to women, and thus based on an obvious anti-female animus.  *See Gallagher*, 567 F.3d 263, 271 (6th Cir. 2009).  Stander's alleged behavior is remarkably similar to that of the harassers in *Gallagher*, where the Sixth Circuit found sufficient evidence to support a finding that the harassment was "based on sex." *Id.*  In *Gallagher*, the harassers commonly referred to females as "bitches," "whores," "sluts," "dykes," and "cunts."  *Id.*  They also discussed obscene photographs and pornographic magazines, as well as their own sexual practices and visits to strip clubs.   The defendant argued that these remarks were made in front of both men and women, few of the comments were directed at the plaintiff, and therefore the harassment could not be "based on sex."  *Id.*  However, the Sixth Circuit found that such conduct evinced anti-female animus, irrespective of the harassers' motivation, because it was more offensive to women and the "natural effect of exposure to such offensive conduct is embarrassment, humiliation and degradation." *Id.*

Although Stander's comments are not identical to those made in *Gallagher*, the comments and conduct are similar enough to create a genuine issue of material fact as to whether the behavior was sexually explicit and patently offensive and, thus, "based on sex." Like the derogatory words used in *Gallagher*, Stander described other females in the workplace as "bootylicious" and "having a butt like a butterflied porkchop."  At oral argument, defense counsel argued that these statements were common in pop-culture

19

vernacular, distinguishing them from the comments made in *Gallagher*.  While these words may be acceptable in today's culture, that is an issue of fact for a jury to decide. Additionally, like the harassers in *Gallagher*, Stander openly talked about sexual encounters she had with a coworker as well as sexual encounters she desired with other coworkers.  A reasonable juror could find that these comments were more offensive to women than men and, ultimately, evinced an anti-female animus.

### E.    Material Issues of Fact Exist as to Whether Stander's Behavior was Severe and Pervasive

Sufficient evidence also exists to create a genuine issue of material fact as to whether Stander's conduct created a hostile work environment.  The Sixth Circuit defines the standard for this element as follows:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Gallagher*, 567 F.3d at 273 (quoting *Williams v. General Motors*, 187 F.3d 553, 566 (6th Cir. 1999)).  When applying this objective/subjective inquiry, "the focus . . . should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Williams*, 187 F.3d at 566.  The court should not apply this two-part test to individual instances of harassment, but should instead look at the totality-of-circumstances and consider the accumulated effect of such incidents.  *Id.* at 563.  Therefore, the work environment as a whole must be considered when making this determination.

20

The Supreme Court has held that the following factors should be considered when determining whether the work environment is "hostile" or "abusive": "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

### 1.    Objectively Hostile

Defendant argues that Stander's behavior was immature and mildly offensive, but does not rise to the level of objectively hostile. Defendant attempts to bolster its argument by comparing Stander's behavior to cases that considered similar behavior. More specifically, Defendant relies heavily on *Knox v. Auto Products Manufacturing*, 375 F.3d 451, 459 (6th Cir. 2004), where the Sixth Circuit held that conduct was not objectively hostile even though coworkers used "the f-word," they "took the Lord's name in vain," and one coworker continuously made sex-related comments, such as commenting on different "women's good looking behind[s]," and talked about "sleeping with different women . . . ." *Id.* While these comments are similar to those made by Stander, *Knox* is distinguishable from the case at hand because it does not also address Stander's physical conduct. For example, *Knox* does not address a harasser who routinely puts her hands down her pants or underneath her shirt, reveals her upper thigh, or "moons" fellow co-workers.

Defendant also analogizes this case to *Johnson v. Hondo, Inc.*, 125 F.3d 408 (7th Cir. 1997), for the proposition that an objectively hostile environment is not created when a coworker or supervisor gropes him or herself. However, Defendant's reliance on *Johnson* is misplaced because the Seventh Circuit did not reach that conclusion. The trial court granted summary judgment in favor of the defendant because the complained-of conduct

21

was not sufficiently severe or pervasive, nor was the plaintiff harassed because of his sex. *Id.* at 412.  The circuit court affirmed the trial court's decision *solely* on the grounds that the plaintiff was not subjected to harassment because of his gender.  The Seventh Circuit made no determination about whether an objectively hostile environment is created when a coworker or supervisor gropes him or herself.  *Id.*

In citing *Knox* and *Johnson*, Defendant also mistakenly suggests that the Court should analyze each of Stander's actions and comments in isolation.  Instead, the "evaluation of the work environment must take into account the totality of the circumstances."  *Gallagher*, 567 F.3d at 273.  "This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility."  *Williams v. General Motors*, 187 F.3d 553, 563 (6th Cir. 1999).  "Even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation."  *Id.*  While other courts have held that pieces of Stander's behavior viewed in isolation may not create an objectively hostile work environment, neither of the cases Defendant relies on address Stander's behavior in its totality.

When the totality of circumstances are considered, a reasonable juror could conclude that Stander's behavior created a hostile work environment.  In order to appreciate the hostility caused by Stander's behavior, it is important to consider the workplace as a whole.  *Gallagher*, 567 F.3d at 274.  Both women worked for the Department of Community Based Services, an administrative agency of the Commonwealth

that responds to reports of sexual abuse.  As such, a reasonable person in this setting may be more sensitive to sexually-charged behavior.

Additionally, Stander's behavior involved offensive conduct and comments that occurred on a near-daily basis.  Her vulgar and boorish behavior was not spread over time and few and far between such that it could not be found to create an objectively hostile environment.  *See Galeski v. City of Dearborn*, 435 F. App'x 461, 467-68 (6th Cir. 2011) (holding that where the alleged harasser offered the plaintiff two compliments, once described his pornography collection, and once described a situation where he was sexually aroused over a two year period amounted to isolated incidents that were not severe or pervasive enough to establish a hostile work environment).  Instead,

> Stander would come into [Plaintiff's] office on a daily basis every day.  And anywhere from five to 30 minutes of time, sometimes longer, she would sit down at . . . [Plaintiff's] desk, prop her feet up on [Plaintiff's] desk two, two and a half feet apart with a dress or a skirt.  If she had a skirt on, she would rub her legs . . . up and down . . . from her ankle to her behind.  If she had on a wide-tailed skirt, she would prop her legs up and wad it up and put it down between her legs, you know, very revealing . . . You could see her – all the way to her panties.

(Pl. Dep. 54).  Additionally, "on a daily basis . . . [Stander] would put her hands up her shirt and rub her breasts . . . or she'd rear back in her chair and put her hands down . . . in her pants."  (*Id.* at 60).  Interspersed with this daily conduct, Stander frequently made comments about coworkers, such as "Diane has a bootylicious behind," "Angie's got a butt like a butterfly," and "Lorraine's got a big butt, but her stomach is bigger than her behind, and her boobs will hang out over her stomach."  (*Id.* at 64).  Around other coworkers, Stander commented that "she [was] getting wet in her pants because [a coworker] looked so good" and that she "wanted to slip [a female coworker] some tongue."  (Webster Dep.

25).  All of these comments and actions, combined with isolated incidents where Stander discussed her sexual encounters and desires with coworkers, mooned her fellow coworkers, and made sexual references to using Vaseline, could lead a reasonable juror to conclude that Plaintiff was subjected to an objectively hostile work environment.

This determination is supported by the Sixth Circuit's recent decision in *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (2009).  In *Gallagher*, the court found that where the workplace was "permeated with vulgar language, demeaning conversations and images, and palpable anti-female animus," a reasonable person could find the office to be objectively hostile in spite of no evidence that the plaintiff was ever physically threatened or touched.  *Id.* at 274.  Much like *Gallagher*, Plaintiff was never physically threatened or touched.  However, Stander routinely used vulgar language in her description of coworkers' physiques and discussions of her sexual experiences with coworkers.  Plaintiff could not escape these comments; Stander routinely made them around the office, to include in Plaintiff's office, the hallway, and meeting rooms.  Additionally, Stander frequently rubbed her upper thigh, stomach and breasts, while exposing her upper-thigh, underwear and stomach.  On more than one occasion, Stander stuck her hands down her pants and made a massaging motion.  This live manifestation of sexually suggestive behavior and indecent exposure  can be considered even more hostile than the demeaning pornographic images at issue in *Gallagher*.  Therefore, based on the similarities between Stander's behavior and the objectionable behavior at issue in *Gallagher*, a reasonable juror could find that Stander's behavior created an objectively hostile work environment that was demeaning to any woman, and specifically to Plaintiff.

24

Stander's behavior also "unreasonably interfered with [Plaintiff's] work performance." *Williams*, 187 F.3d at 568 (quoting *Harris*, 510 U.S. at 25). "To show such interference, the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The [plaintiff] need only show that the harassment made it more difficult to do the job." *Id.* (internal quotations omitted). The plaintiff is not, however, required to show that she suffered any psychological harm or physical injury, though proof of either certainly supports a finding that the alleged conduct unreasonably interfered with the plaintiff's work performance. *Harris*, 510 U.S. at 22.

Plaintiff alleges that her ability to work and her psychological well-being were affected by Stander's behavior. After "15 to 20 minutes out of [Plaintiff's] day that [Stander] touch[ed] herself or ma[de] some kind of sexually-simulated acts," Plaintiff found it difficult to return to work. (Doc. # 47, at 121). Additionally, Plaintiff was unable to discuss work-related matters with Stander, regardless of where the conversation took place, because Stander would often expose her undergarments or touch her breasts as the two conversed. Stander's behavior caused Plaintiff to be nervous, shake, cry and lose sleep at night. All of these facts could lead a reasonable juror to conclude that Stander's behavior made it more difficult for Plaintiff to do her job.

Downplaying these facts, Defendant contends that Stander's behavior merely wasted Plaintiff's time. Relying on *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997), Defendant argues that merely proving the harassment wasted the plaintiff's time is legally insufficient to show an unreasonable interference with work performance. However, Defendant's reliance on *Zaring Homes* is misplaced. Although the plaintiff in that case did allege that the harassment wasted her time, the court instead relied on the nature of the

25

alleged harasser's behavior to reach its decision. *Id.* at 824-26. Ultimately, the court concluded that the alleged harassment was "merely offensive," and affirmed summary judgment in favor of the employer. *Id.* The court did not consider whether wasted time amounts to an unreasonable interference with work performance. Notwithstanding Defendant's argument about wasted time, Plaintiff has alleged that her work performance was affected in other ways to sufficiently prove that Stander's behavior made it more difficult to do her job.

Defendant also argues that Plaintiff admitted her work performance was not affected by Stander's behavior because she characterized her own performance as "pretty good." (Doc. # 47, at 14). This argument ignores Sixth Circuit precedent that the plaintiff need not show that her actual performance has declined, but only that the alleged behavior made it more difficult to work. *Williams*, 187 F.3d at 568. Even if Plaintiff's work performance remained "pretty good," the issue remains as to whether Stander's behavior affected Plaintiff's *ability* to work. Plaintiff has brought forth sufficient facts for a reasonable juror to conclude that her work performance was affected by Stander's behavior and that the work environment was objectively hostile.

### 2.    Subjectively Severe or Pervasive

The subjective test asks whether the plaintiff "subjectively found the conduct to be severe *or* pervasive." *Williams*, 187 F.3d at 568 (emphasis added). "Severe or pervasive" is properly considered in the disjunctive. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009). The severity inquiry looks at the nature of the alleged conduct, while the pervasive inquiry assesses the duration and frequency of the conduct. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 984-85 (6th Cir. 2000) (holding that three instances of alleged

26

harassment over a six-month period were not as pervasive as the fifteen incidents which occurred in *Williams*, nor was the nature of the three instances sufficiently severe). Although the pervasive inquiry cannot be answered by applying a strict mathematical formula, the Sixth Circuit has held that fifteen offensive incidents which occurred over a year-long period as well as routine inappropriate remarks made over the course of seven years sufficiently proved that the conduct was pervasive. *Williams*, 187 F.3d at 559; *Albeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 248 (6th Cir. 1998). *See also Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (holding that seventeen incidents of harassment occurring over approximately three years presented more of an ongoing pattern of harassment sufficient to support a hostile work environment claim).

Defendant argues that Stander's behavior was not subjectively severe or pervasive because Stander's behavior did not unreasonably interfere with Plaintiff's work performance and the two remained friends throughout the alleged harassment.  The Court has already considered both of these arguments in the context of other elements to this Title VII claim and concluded that a genuine issue of material fact exists as to both.  In short, a reasonable juror could conclude that Stander's behavior did unreasonably interfere with Plaintiff's work performance and that their friendship ended as a result of Stander's behavior.

For all of these reasons, genuine issues of material fact exist as to whether Plaintiff perceived the conduct as both severe and pervasive.  Plaintiff testified that she perceived Stander's behavior as sexual and severe, causing her to cry, be nervous, and lose sleep. Plaintiff also testified that she was subjected to Stander's behavior on a near-daily basis, lasting for at least a year.  Stander's behavior was certainly as frequent and long-lasting

27

as other cases where the Sixth Circuit has concluded that the alleged harassment was pervasive. *See Williams*, 187 F.3d at 559; *Albeita*, 159 F.3d at 248. Considering both the frequency and nature of Stander's behavior, a reasonable juror could conclude that Stander's behavior was subjectively severe and pervasive.

### F.     Genuine Issues of Material Fact Exist as to Whether Defendant is Vicariously Liable for Stander's Behavior

To determine whether the employer is vicariously liable for the hostile work environment, the Sixth Circuit applies different standards based on whether the alleged harasser is a supervisor or coworker of the alleged victim. *Clark ,* 400 F.3d at 348. If the alleged harasser is a coworker of the victim, the "employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* (quoting *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999)). Conversely, an employer is presumed to be vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the victim, unless the employer is able to raise an affirmative defense *Id.*

Defendant argues that Stander was a co-worker of Plaintiff and the Court should, therefore, apply the "knew or should have known" test to determine whether Defendant is vicariously liable. The Sixth Circuit has held that a supervisor is "an individual who serves in a supervisory position and exercises a significant control over the plaintiff's hiring, firing or conditions of employment." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994) (internal quotations omitted). Although the Supreme Court has yet to articulate a definition for "supervisor" under Title VII, *Summerville v. Ross/Abbott Laboratories*, 187 F.3d 638, at *7 (6th Cir. 1999) (table), it has found that an employee who "directly

28

controll[ed] and supervis[ed] all aspects of [the plaintiff's] day-to-day activities" is also a supervisor.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998).  If the alleged harasser lacked this requisite degree of control or authority over the Plaintiff, then the harasser is considered a coworker.

Here, Angie Taylor was the supervisor of both Plaintiff and Stander pursuant to the leadership structure of Defendant.  However, when Taylor took leave from work, sometimes up to two weeks at a time, Stander covered Taylor's responsibilities.  In Taylor's absence, Stander assigned cases to members of the team, including Plaintiff.  She also reviewed reports submitted by team members to determine whether they should be approved or returned to the team member for further work.  Stander's other responsibilities included approving employees' requests for time off and reviewing employees' time sheets to determine whether they should receive comp time.  Defendant asserts that these responsibilities do not qualify Stander as a "supervisor" pursuant to Sixth Circuit's definition because Stander did not exercise significant control over Plaintiff's hiring, firing or conditions of employment.

Assuming *arguendo* that Stander was Plaintiff's coworker, genuine issues of material fact remain as to whether Defendant knew or should have known  of the charged sexual harassment and failed to implement prompt and appropriate corrective action.   "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized - or is reasonably believed by a complaining employee to have been authorized - to receive and respond to or forward such complaints to management."  *Gallagher*, 567 F.3d at 277.

Beginning in June, 2007, Plaintiff made monthly complaints to her supervisor, Angie Taylor, about Stander's behavior, yet Stander's behavior continued. Without investigating, Taylor often responded to Plaintiff's complaints in a nonchalant or dismissive fashion, saying to Lisa, "Now Lisa," "Lisa quit," or "Lisa Stop," without taking further action. On one occasion, Taylor responded to Plaintiff's complaint by saying, "You are [Stander's] friend. You tell her. She'll listen to you." (Pl. Dep. 70). Morever, Joel Griffith and Patti Murphy, upper-level officials of Defendant, agree that Plaintiff sufficiently brought Stander's harassing behavior to Taylor's attention on at least one occasion, in compliance with Defendant's anti-sexual harassment policy.

Despite the overwhelming evidence that Defendant was on notice of Stander's behavior, Defendant argues that it made attempts to correct Stander's behavior. On at least three occasions, Taylor had private discussions with Stander in response to Plaintiff's concerns. Plaintiff acknowledges that Taylor and Stander did converse after she lodged complaints, however the record is devoid of evidence suggesting the content or nature of Taylor and Stander's discussions. Moreover, despite Taylor's reprimands, Stander's behavior continued unabated. Combined, these facts suggest that Angie Taylor knew about Stander's conduct and failed to take effective corrective action, thus precluding summary judgment in favor of Defendant.

Alternatively, if Stander was considered a "supervisor," the aforementioned facts also create genuine issues of material fact precluding Defendant from prevailing on the affirmative defense to supervisory liability. So long as no tangible employment action has been taken against the plaintiff, an employer may prevail on an affirmative defense for the actions of its supervisor if (1) it "exercised reasonable care to prevent and correct promptly

30

any sexual harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Gallagher*, 567 F.3d at 275.  As previously stated, Plaintiff took advantage of Defendant's anti-sexual harassment policy by bringing Stander's behavior to Taylor's attention on multiple occasions, but Taylor often laughed off the complaints and Stander's behavior continued.  Therefore, genuine issues of material fact exist as to whether Defendant meets either element of the affirmative defense.

### III.  CONCLUSION

For the reasons stated herein, Plaintiff has brought forth sufficient evidence to prove a *prima facie* case of hostile work environment based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, and Kentucky's Civil Rights Act, KRS 344.010 *et seq.*   Disputed factual issues preclude summary judgment in favor the Defendant.  Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 36) be, and is hereby **denied**.

**IT IS FURTHER ORDERED** that if the parties are interested in participating in a settlement conference before the presiding Magistrate Judge (Smith) in advance of the final pretrial conference (which has not been scheduled), they are instructed to contact the Magistrate Judge's chambers directly.

This 2nd day of February, 2012.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\Covington\2009\2-09-206-MOO denying MSJ.wpd